**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **DENISE FIRESTINE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:13-CV-00112** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Denise Firestine appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

### I. PROCEDURAL HISTORY

Firestine applied for DIB in October 2010, alleging disability as of May 5, 2010. (Tr. 135-36.) The Commissioner denied her application initially and upon reconsideration, and Firestine requested an administrative hearing. (Tr. 72-73, 76-122.) On April 7, 2011, a hearing was conducted by Administrative Law Judge ("ALJ") Jennifer Fisher, at which Firestine, who was represented by counsel, and a vocational expert ("VE") testified. (Tr. 26-64.) On December 2, 2011, the ALJ rendered an unfavorable decision to Firestine, concluding that she was not disabled because she could perform her past relevant work as a receptionist as it is generally

---

[1] All parties have consented to the Magistrate Judge. (Docket # 15); *see* 28 U.S.C. § 636(c).

performed, in addition to a significant number of other unskilled, light jobs in the national economy. (Tr. 21-22.) The Appeals Council denied Firestine's request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-5.)

Firestine filed a complaint with this Court on April 15, 2013, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Firestine argues that the ALJ: (1) improperly discounted the credibility of Firestine's symptom testimony; and (2) assigned a residual functional capacity ("RFC") that is not supported by substantial evidence. (Social Security Opening Br. of Pl. 6-11.)

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Firestine was fifty-three years old (Tr. 22, 72); had an associate's degree in marketing (Tr. 31); and had work experience as an administrative assistant, human resources assistant, receptionist/clerk, sales associate, and in data entry (Tr. 164). Firestine alleges that she is disabled due to scoliosis, sacroiliitis, bulging disks, and history of a right knee fusion. (Tr. 163.)

At the hearing, Firestine stated that her back started hurting about the time her most recent temporary job as a receptionist ended in May 2010. (Tr. 36-38.) Although she had her right knee fused in childhood as a result of a benign tumor, she worked for many years before her back started hurting. (Tr. 39-40.) She thought she now was unable to work because she could not "sit there for periods of time without moving" or "lift anything heavy anymore." (Tr. 38.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 258-page administrative record necessary to the decision.

2

Firestine described her back pain as a "nagging pain, nagging ache" in her buttocks that travels down her thigh, stating that "[s]ome days are better or worse than others." (Tr. 42, 50.) On a ten-point scale, she rated her pain as a "four" or "five" with medication and a "five" or "six" when the medication starts to wear off. (Tr. 49-50.) Her back hurts more in the morning, and it takes her "a couple hours to get going." (Tr. 43, 50.) She estimated that she has four or five bad days a month when she does nothing at all. (Tr. 50.) She has received several spinal injections and physical therapy, and takes Mobic and Tramadol without complaint of side effects. (Tr. 41-43.)

As to her physical limitations, Firestine cannot bend her right knee due to the fusion, and thus, she sits forward in a chair because otherwise "the edge of the chair cuts off the circulation on the back of [her] thigh." (Tr. 43.) For that same reason, she props her leg up on a twelve-inch box when seated for a length of time. (Tr. 44-45.) She reported that she could sit for thirty minutes before needing to "be up" for five to ten minutes to help the circulation in her legs. (Tr. 46-48.) When up, she "usually get[s] up and walk[s] around or go[es] into the kitchen," stating that "it's moving around as opposed to just standing." (Tr. 48.) She estimated that she could lift up to ten pounds. (Tr. 38.)

### B. Summary of the Relevant Medical Evidence

At age thirteen, Firestine had a benign tumor removed from her right femur adjacent to her knee, and her right knee was fused in an extended position. (Tr. 209.) During the procedure, a bone graft was taken from her right hip, and her left femur was shortened to equalize her leg lengths. (Tr. 209.)

On June 9, 2010, Firestine complained to her doctor of a two-month history of pain in her

low back and left hip/buttocks that radiated down her leg. (Tr. 201.)  He referred her to Dr. Barry Liechty, an orthopedist. (Tr. 206.)

Later that month, Dr. Liechty evaluated Firestine. (Tr. 206-07.)  He observed that her right knee was fused in an extended position. (Tr. 206.)  She could touch the floor in forward flexion, and had limited extension with discomfort. (Tr. 206.)  She had good range of motion in her hips, but could not toe walk and had some weakness in her left anterior tibia and toe extensors. (Tr. 206.)  X-rays of her lumbar spine showed scoliosis, facet joint arthritis, and potential for lateral stenosis of the lower lumbar spine and discogenic disease; but x-rays of her hips were unremarkable. (Tr. 206.)  His impression was lumbar spine degenerative disc disease, scoliosis, and facet joint arthrosis. (Tr. 207.)  He referred her to Dr. Mark Zolman for conservative care and ordered an MRI of her lumbar spine, which revealed marked thecal sac compromise at the L3-L4 level, a large right facet joint synovial cyst causing marked deformity of the thecal sac, and mild degenerative disc disease at L2-L3. (Tr. 207, 209-10.)

The following month, Dr. Zolman evaluated Firestine. (Tr. 254-55.)  On a ten-point scale, she rated her pain a "two" at its best and a "seven" at its worst, reporting that it was aggravated by walking and bending; she was taking Ibuprofin. (Tr. 254.)  Range of motion of the lumbar spine was within functional limits, but painful upon flexion. (Tr. 254.)  There was tenderness around the sacrum, SI joints, and left trochanter. (Tr. 254.)  She had difficulty with toe walking, left more than right, but had normal lower extremity strength. (Tr. 254.)  He prescribed Mobic, Ultram, and a course of prednisone and physical therapy; he also stated that he would consider sacroiliac joint injections. (Tr. 255.)

In August 2010, Firestine told Dr. Zolman that her pain was "about 60% improved" from

4

her last visit. (Tr. 253.) She rated her pain a "three" at its best and a "five" at its worst. (Tr. 253.) She demonstrated full strength in her lower extremities, and her gait was stable and nonantalgic. (Tr. 253.)

Firestine participated in physical therapy from July 15 to September 8, 2010. (Tr. 214-43.) At her first visit, the physical therapist wrote that Firestine presented with signs and symptoms consistent with discogenic-type pain with lumbar instability. (Tr. 236.) She had significant tenderness over bilateral piriformis and decreased mobility of her left hip. (Tr. 236.) She demonstrated "decreased core strength and lumbar stabilization as well as gait quality." (Tr. 236.) Her pain was aggravated with standing 30 to 45 minutes and when transitioning from sit to stand, and was alleviated by lying down. (Tr. 236.) During the weeks of therapy, improvement was noted overall, although some buttock pain persisted and muscle testing revealed some reduced strength in Firestine's lower extremities, more on the left than the right. (Tr. 214-43.) Upon discharge, the physical therapist wrote that Firestine was "progressing well with lumbar stabilization and core strength" and had increased hip and gluteal strength and less buttock pain. (Tr. 214.) She instructed Firestine to continue her home exercise program. (Tr. 214.)

On September 3, 2010, Dr. Mark Zolman administered a sacroiliac joint injection to Firestine. (Tr. 250-52.) Within two weeks, she reported about a 50% improvement in her symptoms, rating her pain a "one" at its best and a "four" at its worst. (Tr. 249.) She demonstrated good lumbar motion, normal lower extremity strength, and a stable and nonantalgic gait. (Tr. 249.) Her physical exam results were similar in December 2010. (Tr. 248.) She reported at that appointment that her symptoms were 95% better, rating her pain a "zero" at its best and a "two" at its worst. (Tr. 248.)

By June 2011, Firestine told Dr. Zolman that "her symptoms have shown some improvement" and that "[o]verall, [she was not in] as much pain." (Tr. 258.) However, she rated her pain a "three" currently and a "six" at its worst, which were higher numerical ratings than at her last appointment. (Tr. 258.) She had some tenderness around the sacrum and sacroiliac joints, right greater than left. (Tr. 258.) Her gait was stable and nonantalgic, and her lower extremity strength was normal bilaterally. (Tr. 258.) Dr. Zolman continued her Mobic and Ultram, encouraged her to continue her home exercise program, and scheduled her to return in six months. (Tr. 258.)

*C. The VE's Testimony*

At the hearing, the ALJ posed a series of hypotheticals to the VE that assumed an individual of Firestine's age, education, work experience, and ultimately, RFC. (Tr. 54-64.) The VE responded that such a person could perform Firestine's past work as a receptionist as it is generally performed in the economy, explaining that people employed in such a position "are able to sit or stand as they need to." (Tr. 56-57.) The VE elaborated upon the ALJ's questioning:

> Q  So, what you're envisioning is a person who is primarily seated, standing for brief periods in between sitting, is that correct?
>
> A  Yes, Your Honor. But a person may stand, but . . . the difficult[y] comes in . . . when the person has to enter the data or operate machinery, you know, the office equipment at the work station. It's usually set up for a sedentary position. So, the person performing the receptionist duties, could stand for 15 minutes, could sit for 15 minutes and perform the work as long as there was a minimal amount of traffic into the business.
>
> Q  So, . . . it would be flexible, but not entirely at will.
>
> A  Correct.
>
> . . . .

6

> Q	Okay. What is the normal break schedule?
>
> A	15-minute break in the morning, a 30-minute-lunch break, and then a 15-minute break in the afternoon.
>
> Q	And we've kind of talked about that there is additional time that you can stand and stretch. What's the overall allowance for anything beyond those normal breaks?
>
> A	What's normally understood in the industry as tolerated by most employers is an additional 30 to 45 minutes of time interspersed throughout the day that a person may be off task, but still must maintain at least an 80 percent production rate, and that allows for those stretches or conversation or bathroom breaks.
>
> Q	And, with this being a semi-skilled job, is there more flexibility than, say, for example, in an unskilled job?
>
> A	Yes. It's not a production-type job, meaning, that the person in a receptionist position . . . isn't part of a team or coordinated effort, in that, somebody relies on him or her in the course of the product . . . . And understandably, the receptionist is the one who is responsible for greeting the visitors to the facility, but a five-minute-bathroom break would be possible with a simple sign at the desk saying [INAUDIBLE] back, and the work would still be able to be performed to the employer's standard.

(Tr. 58-60.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial

7

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

**IV. ANALYSIS**

*A. The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5)

whether the claimant is incapable of performing work in the national economy.[3] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On December 2, 2011, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 16-22.) She found at step one that Firestine had not engaged in substantial gainful activity after her alleged onset date, and at step two that she had the following severe impairments: lumbar degenerative disc disease, scoliosis, arthritis of the hip and knee, sacroiliitis, history of right knee fusion, and mild obesity. (Tr. 18.) But the ALJ determined at step three that Firestine's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 18-19.)

> Before proceeding to step four, the ALJ assigned Firestine the following RFC:
>
> [T]he claimant has the [RFC] to lift/carry 10 pounds occasionally; stand/walk 4 hours total in an 8-hour day; sit 4 to 6 hours total in an 8-hour day, 30 minutes continuously. Although the limits on continuous sitting implicate the need to alternate sitting and standing, the individual can remain at the workstation and on task; she must never climb ladders, ropes, or scaffolds, kneel, crouch, or crawl; occasionally climb ramps/stairs, balance, stoop; no operation of foot controls; no exposure to workplace hazards such as unprotected heights, slippery/uneven surfaces; and she must elevate her leg to 12 inches while seated.

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

(Tr. 19.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that despite the limitations caused by her impairments, Firestine was able to perform her past relevant work as a receptionist as it is generally performed in the national economy. (Tr. 21.) The ALJ noted that the VE further testified that a hypothetical individual of Firestine's age, education, experience, and RFC could perform a significant number of other unskilled, light occupations within the economy, including storage facility rental clerk, office helper, and laundry worker. (Tr. 22.)

### C. *The ALJ's Credibility Determination Will Not Be Disturbed*

When determining the credibility of a claimant's symptom testimony, an ALJ must "consider all of the evidence" presented, including the objective medical evidence; the daily living activities; location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors of pain or symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or symptoms; treatment, other than medication, received for relief of pain or symptoms; any measures used to relieve pain or symptoms; and other factors concerning functional limitations or restrictions due to pain or symptoms. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2-8.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is

"patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, Firestine argues that the ALJ's credibility determination should be remanded because it was "incomplete and failed to consider all of the regulatory factors." (Social Security Opening Br. of Pl. 8.) Specifically, Firestine complains that although the ALJ considered the medical evidence, her response to treatment, and the opinion evidence, she failed to consider the consistency of her statements, her work history, her need to lean forward in a chair at the hearing, her use of other measures to relieve pain, or the "correspondence between her alleged onset date and the medical evidence of the onset of her back pain." (Social Security Opening Br. of Pl. 9-10.)

Contrary to Firestine's assertion, the ALJ's credibility determination is adequately supported. To reiterate, an ALJ need only minimally articulate his findings and does "need not discuss every factor listed in [SSR] 96-7p." *Dullen v. Astrue*, No. 1:10-cv-719, 2011 WL 4625756, at *8 (S.D. Ind. Sept. 30, 2011); *accord Hoffman v. Barnhart*, No. 02 C 8187, 2005 WL 66049, at *17 (N.D. Ill. Jan. 12, 2005); *see also Richardson v. Astrue*, No. 1:11-cv-01002, 2012 WL 4467566, at *10 (S.D. Ind. Sept. 26, 2012) ("It is not necessary that the ALJ recite findings on every factor, but the ALJ must give reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers have a fair sense of how the claimant's testimony was assessed.").

When making his credibility determination, the ALJ recited the "boilerplate" language that the Seventh Circuit Court of Appeals has repeatedly criticized. *See Ronning v. Colvin*, __ F.

11

App'x __, 2014 WL 593675, at *3 (7th Cir. Feb. 18, 2014) (unpublished) (collecting cases). That is, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [assigned] residual functional capacity assessment." (Tr. 20); *see Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) ("Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.").

But as the Seventh Circuit explained in *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012), "[i]f the ALJ has otherwise explained his [credibility] conclusion adequately, the inclusion of [the template] language can be harmless." *See also Ronning*, 2014 WL 593675, at *3 ("[W]e will uphold the credibility determination [despite the template language], if the ALJ provided specific reasons for discrediting the claimant's testimony."). Here, in the paragraphs immediately following the template language, the ALJ first observed that the objective medical evidence did not necessarily support Firestine's complaints of disabling symptoms. For example, she noted that aside from thecal sac compromise, MRIs show just mild degenerative changes in Firestine's hips and lumbar spine. (Tr. 20.) And although some tenderness was noted in exams, Firestine generally had good hip and lumbar range of motion with minimal discomfort, and her gait was consistently stable and nonantalgic. (Tr. 20-21); *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record.").

The ALJ also considered that Firestine's treating physicians recommended conservative

12

care for her back symptoms–that is, medications, physical therapy, home exercises, and injections. (Tr. 20-21); 20 C.F.R. § 404.1529(c)(3) (considering a claimant's use of medications and treatment measures as two factors in analyzing claimant's subjective symptoms); SSR 96-7p; *see Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (finding that claimant's subjective complaints of disabling pain were not entirely credible where the claimant's treatment was "routine and conservative"); *Ross v. Astrue*, No. 08-C-450, 2009 WL 742761, at *3 (E.D. Wis. Mar. 17, 2009) (same); *Christianson v. Astrue*, No. 3:07-cv-00485, 2008 WL 3559623, at *7 (W.D. Wis. Feb. 6, 2008) (same); *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. 2008) (same).

And the ALJ also found that Firestine's symptoms improved with treatment. The ALJ noted that Firestine's physical therapist wrote when discharging her that she "progressed well with lumbar stabilization and core strength with less buttock pain noted." (Tr. 20.) And after her course of prednisone, Firestine reported 60% improvement in symptoms in August 2011, and after her injections, up to a 95% improvement in December 2010. (Tr. 20-21.)

On this point, however, Firestine accuses the ALJ of ignoring that by June 2011 her pain had returned to the "same level" as before treatment. (Social Security Opening Br. of Pl. 9 n.3.) But that assertion mischaracterizes the record. Although Firestine reported higher numerical pain ratings at her June 2011 visit to Dr. Zolman (a "three" currently and a "six" at worst) than at her preceding visit, they still remained one level lower than before she started treatment in July 2010 (a "four" currently, a "two" at best, and a "seven" at worst). Moreover, Firestine told Dr. Zolman in June 2011 that "her symptoms had shown some improvement" since her last visit, and that "[o]verall, [she was] not [in] as much pain." (Tr. 258.) Therefore, the ALJ's observation

13

that Firestine had experienced improvement has support in the record.

Moving on, in addition to considering the types and effects of treatment, the ALJ expressly noted the location and duration of Firestine's pain. That is, the ALJ described Firestine's pain at several points in her decision, referring to it as "low back pain and left hip/buttock pain radiating down the leg" (Tr. 20), "chronic back pain" (Tr. 20), and "some pain and discomfort in the back and lower extremities" (Tr. 21). The ALJ also considered that Firestine could not perform "heavy lifting" or "sit for prolonged periods" because it aggravated her symptoms, and that she "propped her leg up on a 12-inch box" while working. (Tr. 20.)

Furthermore, the ALJ correctly observed that no treating physician assigned Firestine any work restrictions. (Tr. 21.) Of course, "an ALJ may consider the lack of medical evidence as probative of the claimant's credibility." *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000). "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c)).

Thus, the record reflects that when determining the credibility of Firestine's subjective symptoms, the ALJ did indeed analyze and discuss most of the factors identified in 20 C.F.R. § 404.1529(c) and SSR 96-7p. Firestine's assertion that the credibility determination should be remanded because the ALJ did not also explicitly discuss other factors such as "the consistency of [her] statements, her work history, [and] . . . her use of other measures to relieve pain" overstates the duty of the ALJ to minimally articulate her credibility determination. It is obvious from the hearing transcript that the ALJ was aware of these other factors. (*See* Tr. 32-36 (work history), 38-39, 42-45 (sitting limitations and lifting capacity), 43 (why she was sitting forward

14

in her chair), 48 (when she gets up from sitting she usually "get[s] up and walk[s] around" rather than stands).)

Not to be deterred, Firestine, who was represented by counsel at the hearing, also argues that the ALJ failed to develop the record with respect to these other credibility factors. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) ("While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record."). But Firestine fails to explain in her conclusory, one-paragraph argument what additional evidence needed to be developed. *See generally Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988) "[A]n ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made [her] best case."). She does not suggest that the medical records were incomplete or that particular topics were not adequately discussed at the hearing. How much evidence to gather is a subject on which the courts generally respect the Commissioner's reasoned judgment. *See Nelms*, 553 F.3d at 1098 ("[A] significant omission is usually required before this court will find that the [Commissioner] failed to assist *pro se* claimants in developing the record fully and fairly." (citing *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994))).

In sum, the ALJ adequately considered the credibility of Firestine's symptom testimony in accordance with the factors identified in 20 C.F.R. § 404.1529(c) and SSR 96-7p and ultimately determined that her symptoms were not of disabling severity. In doing so, the ALJ sufficiently built an accurate and logical bridge between the evidence and her conclusion, and her determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435. Accordingly, the ALJ's credibility determination will be given the

special deference it is due. *Powers*, 207 F.3d at 435.

### D. The RFC Assigned by the ALJ Is Supported by Substantial Evidence

Next, Firestine claims that the RFC assigned by the ALJ is not supported by substantial evidence, asserting that "the ALJ failed to cite any evidence in support of her finding that Firestine could remain on-task while alternating between sitting and standing throughout the day." (Social Security Opening Br. of Pl. 6.) Like her first argument, Firestine's second argument fails to warrant a remand.

The RFC is a determination of the tasks a claimant can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. § 404.1545.

Firestine argues that the ALJ erred by failing to specifically discuss and incorporate into the RFC her purported need to "get up" and "mov[e] around" after thirty minutes of sitting to get the circulation back in her legs. (Tr. 47.) She emphasizes that when she gets up at home, she does not simply stand in on place, but "walk[s] around or go[es] into the kitchen . . . ." (Tr. 48.) This need to walk around every thirty minutes, she asserts, would take her off task more than 80% of the workday, the percentage an employee is generally expected to remain on task outside of the normal break schedule. (Tr. 57, 59.)

But to reiterate, the ALJ expressly acknowledged Firestine's testimony that "she cannot

16

sit for prolonged periods." (Tr. 20.) Although Firestine explained that after thirty minutes of sitting she "usually get[s] up and walk[s] around or go[es] into the kitchen or something" (Tr. 48), she concedes that she cannot point to any medical source opinion instructing her to do so. (*See* Social Security Opening Br. of Pl. at 7 ("[T]he only evidence of record on this issue [concerning her need to walk around] is Firestine's sworn testimony . . . .").) As such, the ALJ was not required to incorporate into the RFC Firestine's uncorroborated assertion concerning her purported need to "walk around." *See Carrasco v. Astrue*, No. 12 C 0483, 2013 WL 4516413, at *10 (N.D. Ill. Aug. 26, 2013) (affirming the ALJ's RFC for sedentary work with a sit-to-stand option where the claimant testified she had to walk around for thirty minutes after sitting thirty minutes, but such limitation was not documented by the medical evidence).

Indeed, restrictions for a claimant's impairments need only be incorporated "to the extent that the impairment is supported by the medical evidence." *Jens*, 347 F.3d at 213 (concluding that claimant's claim of continuing absenteeism was not an impairment supported by the medical evidence); *see also Martinez v. Astrue*, No. 11 C 8687, 2012 WL 5830613, at *11 (N.D. Ill. Nov. 16, 2012) (finding that in the absence of any medical support for claimant's stated need to elevate her legs, the ALJ reasonably declined to accept this aspect of her testimony). Here, the ALJ found Firestine's symptom testimony not credible to the extent it exceeded the RFC, and therefore, the Court obviously did not fully credit Firestine's claim that she needed to walk around for five or ten minutes after every thirty minutes of sitting. *See, e.g*, *Prostka v. Barnhart*, No. 03 C 3764, 2004 WL 1151578, at *9 (N.D. Ill. Apr. 29, 2004) (concluding that the ALJ's failure to specifically discuss claimant's testimony that he needed to elevate his legs and walk around after sitting and incorporate such limitation into the RFC was not error given the absence

of any medical record or evaluation suggesting that claimant actually needed to do so).

Furthermore, the state agency physicians concluded that Firestine could sit, subject to normal breaks, for six hours in a workday. (Tr. 68); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 839 (N.D. Ind. 2004) ("The regulations, and this Circuit, clearly recognize that reviewing physicians . . . are experts in their field, and the ALJ is entitled to rely on their expertise." (citing 20 C.F.R. § 404.1527(f)(2)(i))). The ALJ assigned their opinion "some weight" (Tr. 21), but ultimately chose to afford Firestine an even greater limitation by incorporating a sit-to-stand provision in the RFC.

The ALJ then relied upon the VE's testimony that a hypothetical individual with Firestine's RFC could perform the receptionist job as it is generally performed, staying on task at least 80% of the day. (Tr. 59); *see, e.g.*, *Lofton v. Barnhart*, No. 04 C 0521, 2005 WL 66076, at *11 (N.D. Ill. Jan. 11, 2005) (articulating that the ALJ's step-four finding that he could perform his past relevant work was supported by the vocational expert testimony). Notably, the VE explained that the standard 80% employee productivity allows for "an additional 30 to 45 minutes of time interspersed throughout the day that a person may be off task . . . allow[ing] for those stretches or conversation or bathroom breaks" over and above the normal 30 minute lunch break and two 15 minute breaks in the workday. (Tr. 59-60.)

To reiterate, "the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability." *Scheck*, 357 F.3d at 702. Here, considering that Firestine's assertion that she needs to walk around after thirty minutes of sitting is not supported by any medical documentation, the Court is able to easily track the ALJ's reasoning concerning her assignment of Firestine's RFC, and therefore, the ALJ has done enough. *See Rice v. Barnhart*,

384 F.3d 363, 371 (7th Cir. 2004) (finding that the ALJ satisfied his "minimal duty to articulate his reasons and make a bridge between the evidence and the outcome as to his step five determination"). Consequently, Firestine's challenge to the ALJ's step-four finding does not merit a remand.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Firestine.

SO ORDERED.

Enter for this 11th day of March, 2014.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge